68 So.3d 310 (2011)
Elizabeth R. BAINBRIDGE, Appellant,
v.
James Lawrence PRATT, Jr., Appellee.
No. 1D10-6791.
District Court of Appeal of Florida, First District.
August 4, 2011.
*311 Mark J. Fraser, Gainesville, for Appellant.
No appearance for Appellee.
WOLF, J.
The mother challenges a final judgment determining a parenting plan for the minor child which requires the school-age child to move annually between the mother's and father's homes, which are more than 300 miles apart. She raises a number of issues on appeal, two of which we determine have merit. Specifically, she asserts (1) the trial court violated her due process rights by establishing an annual rotating parenting plan for the minor child which neither parent pleaded for, nor requested at the final hearing, and (2) the trial court abused its discretion where there was no competent substantial evidence supporting that the ordered parenting plan was in the best interests of the minor child.
The mother and the father, who were unmarried, had a daughter on September 19, 2001. In 2004, the parents decided to separate, with the mother and the minor child moving to Gainesville and the father remaining in Orlando. The minor child would generally spend weekends with the father in Orlando and would communicate with him during the week via telephone. This arrangement existed harmoniously until May 2010, when the father married another woman and moved to Shalimar, Florida, some 306 miles away from Gainesville. Around this time, the parties began to disagree regarding the time-sharing of the minor child. On June 17, 2010, the father filed a complaint to establish a parenting plan and time sharing. At the time of the hearing, the minor child was nine years old and in the third grade. Neither party requested an annually rotating parenting plan in the pleadings or at the hearing.
At the hearing, the mother testified that her main reason for moving to Gainesville was that most of her extended family resided in or around the area, including the minor child's maternal grandparents. The mother was studying to be a nurse, and her mother's extended family was helpful in providing emotional support and care for the minor child. In particular, the minor child's maternal grandmother picked her up from school when the mother was unable to do so because of her college schedule.
The mother further testified that the minor child was a "high maintenance" child who was easily distracted and in need of *312 special care. The minor child had been diagnosed with attention deficit hyperactivity disorder (ADHD). She was enrolled in a special Title I program for children with learning troubles. The mother had been the primary advocate for the minor child in school, helping her with homework assignments and ensuring that she obtained the help she needed.
The father testified and corroborated much of the mother's testimony. In addition, the father stated that he had a very good relationship with the minor child and tried to spend time with her as much as possible. He believed that the minor child got along well with both her newborn half-brother and her step-siblings.
At the conclusion of the hearing, the trial court stated, "I think I am going to do something which I think is in [the minor child's] best interests. You both may not be happy with my decision." The trial court then entered a written final judgment ordering an equal, annually rotating time-sharing plan between the mother and the father. The trial court had not previously discussed the possibility of this type of parenting plan, nor had any expert testimony been presented about the viability of such plan. The order read in pertinent parts:
F. It is in the best interests of the minor child that the parties share parental responsibility for their child and that the child spend equal time with each parent, by rotating year to year between the residences of the parents, with the child finishing the 2010-2011 school year with her mother. The parties are coequal in all factors of Section 61.13(3) Florida Statutes although the Court has come [sic] concerns regarding the child's school changes.
. . . .
a. The home residence of the child shall rotate between the residences of the parties from year to year. The Mother's residence is designated the child's home residence for the purpose of maintaining a permanent address for the child's school and medical records during the 2010-2011 school year until June 30, 2011 and alternate school years thereafter. The Father's residence is designated the child home residence for the purpose of maintaining a permanent address for the child's school and medical records during the 2011-2012 school year until June 30, 2012 and alternate school years thereafter. This designation does not carry with it any more status or power, or make one parent more in charge.
We reverse this parenting plan because, regardless of the bare assertion made by the trial court that this type of plan is in the "best interest of the minor child," there is no evidence supporting this assertion. Specifically, while the trial court used the "magic words," there is nothing in the record to support that this unusual arrangement, which forces a minor child with special needs to change schools and acclimate to new surroundings every year is, in fact, in the best interests of the child. The mere fact that the trial court feels both parents are equal under section 61.13(3) does not mean that this rotating parenting plan is in the best interest of the child.
Prior to 2008, the underlying rotating parenting plan was traditionally referred to as "rotating custody." See Ch. 2008-61, § 6, at 792, Laws of Fla. Rotating custody covered similar plans that rotated the primary residential parent on an annual, semi-annual, or weekly basis. See, e.g., Chapman v. Prevatt, 845 So.2d 976, 979-80 (Fla. 4th DCA 2003); Ruffridge v. Ruffridge, 687 So.2d 48, 49 (Fla. 1st DCA 1997); Langford v. Ortiz, 654 So.2d 1237, 1238 (Fla. 2d DCA 1995).
*313 Prior to 1997, Florida courts adhered to the presumption that rotating custody was presumptively disfavored. See, e.g., Ruffridge, 687 So.2d at 50; Langford, 654 So.2d at 1238. In 1997, the Florida Legislature enacted section 61.121, which stated "[t]he court may order rotating custody if the court finds that rotating custody will be in the best interest of the child." Even after the enactment of section 61.121, courts continued to apply the presumption against rotating custody. See Cooper v. Gress, 854 So.2d 262, 266 (Fla. 1st DCA 2003).
However, in 2008, the Legislature abolished the concept of custody and replaced it with "parenting plans" and "time-sharing," where neither parent is designated as the primary residential parent and both parents must comply with a parenting plan that sets out in detail each parent's responsibilities and involvement in the minor child's life. See Ch. 2008-61, § 8, at 742, Laws of Fla. The Legislature also modified section 61.13(2)(c)(1) to state, "[t]here is no presumption for or against the father or mother of the child or for or against any specific time-sharing schedule when creating or modifying the parenting plan of the child." See Ch. 2009-180, § 3, at 1853, Laws of Fla. Thus, currently no presumption exists disfavoring the underlying time-sharing plan. However, as discussed below, there is no evidence that the specific nature of this time-sharing plan is in the best interest of the child.
Section 61.13(3)(a)-(t), Florida Statutes (2010), lists factors which are to be considered in determining the best interests of the child for the purposes of creating a parenting plan. In the instant case, the trial court dealt with all of the statutory factors in only two sentences in the order granting annual, rotating custody. While the trial court stated that it found all of the factors of section 61.13(3) equal with respect to each parent, it engaged in no discussion of these factors. Although there is no statutory requirement that a trial court engage in a discussion as to each of the factors, a discussion of the relevant factors can be helpful in determining whether the trial court's judgment is supported by competent, substantial evidence. See Miller v. Miller, 842 So.2d 168, 169 (Fla. 1st DCA 2003); Adair v. Adair, 720 So.2d 316, 317 (Fla. 4th DCA 1998). For the reasons stated below, we find that the trial court's order granting an annual, rotating time-sharing plan was not supported by competent, substantial evidence.
Section 61.13(3)(e), Florida Statutes (2010), is of particular importance in the case of rotating custody and states, "[t]he geographic viability of the parenting plan, with special attention paid to the needs of school-age children and the amount of time to be spent traveling to effectuate the parenting plan" will be a factor in determining the bests interests of the child.
Further, previous case law has identified factors which cut in favor of ordering a rotating parenting plan. These factors suggest rotating time-sharing may be in a child's best interest if: (1) the child was older and mature, Bienvenu v. Bienvenu, 380 So.2d 1164 (Fla. 3d DCA 1980); Gerscovich v. Gerscovich, 406 So.2d 1150 (Fla. 5th DCA 1981); (2) the child was not yet in school, Parker v. Parker, 553 So.2d 309 (Fla. 1st DCA 1989); Alexander v. Alexander, 473 So.2d 236 (Fla. 2d DCA 1985); Wilking v. Reiford, 582 So.2d 717 (Fla. 5th DCA 1991); (3) the parents lived near each other, Gerscovich; Parker; Bienvenu; (4) the child preferred rotating custody, Gerscovich; (5) the rotation would not have a disruptive effect on the child, Gerscovich; Bienvenu; (6) the periods of time spent with each parent were reasonable, Gerscovich; (7) the periods of custody *314 were related to divisions in the child's life, such as the school year, Bienvenu; and (8) severe acrimony and ill-will existed between the child's parents. Sullivan v. Sullivan, 604 So.2d 878, 879 (Fla. 1st DCA 1992). While we acknowledge there is no longer a presumption to overcome, we feel that these factors are still useful in determining the best interests of the child, especially when considering section 61.13(3)(e) and the propriety of this type of time-sharing plan.[1]
There is no evidence suggesting any of these factors are present here. In addition, the only evidence presented established the minor child was nine years old and not yet mature. She was of school age and was in third grade. The parents lived 300 miles apart. The minor child did not state she would prefer a rotating time-sharing plan. Given the minor child's ADHD and specialized education curriculum, the rotation would have a disruptive effect on her as it would cause her to change schools every year. Annual, rotating time-sharing would deprive the child of the community she had become accustomed to over the past six years of her life. There was no evidence suggesting the length of the proposed time periods was in the minor child's best interest. Last, the father testified that his relationship with the mother had been polite and cordial over the past six years.
Based on the foregoing, there was not sufficient evidence presented to support the trial court's finding that this rotating time-sharing plan was in the best interests of the minor child. See Langford, 654 So.2d at 1238 (reversing bi-annual rotation order where the mother lived in North Carolina and the father resided in Florida, finding the requirement that a school age child switch school environments in the middle of the year was not in the child's best interests); see also Chapman, 845 So.2d at 981 (reversing trial court's order establishing annual, rotating custody where the parents lived in different states and the trial court made no findings that the children would be better suited by a rotating arrangement).
We further find the order must be reversed because under Florida law, a trial court may not order an annual, rotating time-sharing plan where neither parent requested such a plan in the pleadings, nor argued for the plan at the final hearing. See Moore v. Wilson, 16 So.3d 222, 223 (Fla. 5th DCA 2009) (holding the trial court violated the mother's due process rights by ordering weekly rotating custody when weekly rotating custody was not brought up in the pleadings, nor at trial); Flemming v. Flemming, 742 So.2d 843, 844 (Fla. 1st DCA 1999). Florida courts have consistently held that "[it] is fundamental that a trial court is without jurisdiction to hear and determine matters that are not the subject of appropriate pleadings and notice." Lamelas v. Granados, 730 So.2d 387, 388 (Fla. 2d DCA 1999). Courts have reasoned that a party's due process rights are violated when a party is not given notice that the trial court would consider an issue or opportunity to be heard on the matter. See Moore, 16 So.3d at 224.
*315 The instant case is very similar to Flemming, except that the facts of this case are even more compelling. In Flemming, the father requested rotating custody at the final hearing but not in any of the pleadings. 742 So.2d at 844. The mother objected because the topic had not been addressed in any of the pleadings. Id. Over the mother's objection, the trial court ordered rotating custody between parents on a weekly basis. Id. On appeal, this court reversed and held that the trial court abused its discretion in ordering rotating custody because the mother was not put on notice that rotating custody was being considered. Id.
In the instant case, the first time such a plan was mentioned was when the trial judge said, "I think I am going to do something which I think is in [the minor child's] best interests. You both may not be happy with my decision." As a result, due process concerns require us to overturn the decision of the trial court.
For the foregoing reasons, the trial court abused its discretion in ordering the underlying time-sharing plan between the parents. Accordingly, the judgment of this trial court is REVERSED and remanded for further proceedings.
CLARK, J., Concurs; THOMAS, J., Concurs With Opinion.
THOMAS, J. Concurring.
I concur, but write to rely on an additional ground on which to reverse: the Mother correctly argues that reversal is warranted pursuant to section 744.301, Florida Statutes. I agree with the Mother's argument that because the Father never married her before the child's birth, as the biological mother, she is entitled to a statutory presumption that she "is the natural guardian of the child and is entitled to primary residential care and custody of the child unless a court of competent jurisdiction enters an order stating otherwise." § 744.301(1), Fla. Stat. (emphasis added). This unambiguous statute embodies the legislative judgment that a biological mother has a statutory preference to custody against a biological father. As such, that custody cannot be modified except by court order which, by law, must be based on a "substantial, material, and unanticipated change in circumstances and a determination that the modification is in the best interests of the child." § 61.13(3), Fla. Stat. See also Wade v. Hirschman, 903 So.2d 928, 932 (Fla.2005) (holding "unless otherwise provided in the final judgment, the two-part substantial change test used in Cooper applies to modification of all custody agreements.") (citing Cooper v. Gress, 854 So.2d 262 (Fla. 1st DCA 2003)).
I respectfully disagree with those decisions that have read section 744.301 as inapplicable where, like here, a biological father purportedly acts like a father. See, e.g., Stewart v. Walker, 5 So.3d 746, 749 (Fla. 5th DCA 2009) (citing State v. Earl, 649 So.2d 297, 298 (Fla. 5th DCA 1995)).
Section 744.301(1), Florida Statutes, provides:
The mother and father jointly are natural guardians of their own children and of their adopted children, during minority. If one parent dies, the surviving parent remains the sole natural guardian even if he or she remarries. If the marriage between the parents is dissolved, the natural guardianship belongs to the parent to whom custody of the child is awarded. If the parents are given joint custody, then both continue as natural guardians. If the marriage is dissolved and neither the father nor the mother is given custody of the child, neither shall act as natural guardian of the child. The mother of a child born out of wedlock is the natural guardian of *316 the child and is entitled to primary residential care and custody of the child unless a court of competent jurisdiction enters an order stating otherwise.
Although it is correct that the first sentence of this section states, "The mother and the father jointly are natural guardians of their own children ...," this sentence makes no reference to custody, which the statute clearly differentiates from guardianship. In fact, this first sentence, when read in the context of the sentences following, clearly contemplates a child born in wedlock, and is followed by the two possible scenarios in which the parents' marriage can end: one parent dies and the surviving parent remains the child's guardian even if that parent remarries, or the parents' marriage is dissolved via divorce, and the child's guardian is that parent to whom custody is awarded. The statute then also acknowledges that both formerly married parents can be given joint custody, in which case both parents continue as the child's guardian (i.e., the status quo ante). Significantly, the statute does not include a presumption in favor of either parent concerning guardianship or custody in the event of the dissolution of marriage.
Contrast this with the remaining scenario the statute addresses: a child born out of wedlock. In that situation, the statute expressly provides that the mother is not only the child's natural guardian, but is "entitled to primary residential care and custody of the child." Id. The statute provides only one exception to this rule: when a court of competent jurisdiction enters an order stating otherwise. Thus, unlike in a situation where the parents' marriage ends, the statute creates an express presumption in favor of the mother when the child is born out of wedlock.
Based on the foregoing, the legislature has clearly made the judgment, which it is entitled to do, that where a father has failed to marry the mother before the child is born, then the mother is entitled to custody of the child. This legislative judgment must be enforced by the judiciary, and not abrogated by crafting additional qualifications and limitations of the statute. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (reiterating that "courts of this state are `without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.'") (quoting Am. Bankers Life Assurance Co. of Fla. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968)). Such an interpretation violates Article II, section three of the Florida Constitution, which compels the judiciary to respect the legislature's authority to make the law, which in the realm of family law, is broad indeed.
Here, the trial court's ruling violates section 744.301 by ordering a change in the statutory entitlement to custody without any evidence of a material change in circumstances. Thus, I concur in the majority opinion but would also reverse on the basis of section 744.301, Florida Statutes.
NOTES
[1] A recent case, Mudafort v. Lee, 62 So.3d 1196 (Fla. 4th DCA 2011), appears to take the position that these factors enumerated in pre-2009 case law are no longer useful in crafting time-sharing plans and can be ignored. To the extent that is the position of the Fourth District Court of Appeal, we cannot agree. The factors are still useful in determining the propriety of this type of a relationship. See also Corey v. Corey, 29 So.3d 315, 321 n. 5 (Fla. 3d DCA 2009) (Schwartz, J., dissenting) (questioning whether the 2009 amendments, concerned mostly with changes in form and nomenclature, significantly affect previously established substantive case law), rev. granted, 36 So.3d 83 (Fla.2010).